Appeal No. 19-1701 May it please the Court, Counsel. My name is Paul Slocum and I represent the appellant Stephanie Dorris. This is an ERISA case involving the denial of long-term disability benefits. We are seeking reversal and reinstatement of those benefits. Briefly, by way of background, Ms. Dorris, the appellant, graduated from Baylor University with a B.A. in finance and then embarked upon a career as a CPA, a Price Waterhouse, and as a financial consultant. In 1997, she was out in Silicon Valley and founded a company that provided chief financial officer services for start-up high-tech businesses that could not afford their own. She applied for and received long-term disability benefits from Unum, the appellee, in 2003 at the age of 41 and was abruptly, had those benefits until 2008. She underwent 16 separate surgeries for endometriosis and abdominal pain. On top of that, she was diagnosed with Lyme's disease in 2004 and has suffered from a series of cognitive deficits ever since then. In 2005, she was seen at the Stanford Behavioral Medicine Clinic and noted to have severely limited in performing intellectually complex tasks requiring higher levels of reasoning, math, and language skills. So at a critical point here, Mr. Slocum, Ms. Dorris, as I understand it, refused an independent medical examination regarding cognitive impairments, is that right? She did, and Your Honor, the reason for that is Unum had failed to get back to her and respond within the deadlines required by ERISA. Seems like quite a gamble to reject the cognitive impairment examination. She was already been terminated her benefits and we wanted to proceed on with the appeal of that decision. And clearly, you know, by waiting until the last minute and then I would point out, and this is in our brief, that there was an open-ended extension requested by Unum. It was not a matter of let's get Ms. Dorris in here next week and do a neurocognitive examination. It was an open-ended extension that went well beyond the ERISA parameters. Mr. Slocum, can I ask you what I think is a question related to Judge Hamilton's observation there? I've spent some time with the paperwork. Is it Dr. Harris? It is, Your Honor. Okay. With Dr. Harris's paperwork, and is there a place in it that you can point us to where Dr. Harris speaks to your client's cognitive limitations, cognitive impairments? There is, Your Honor. Well, actually, I mean, throughout our brief and throughout the entirety of the examinations that Dr. Harris sat with Ms. Dorris, those cognitive deficits are noted. I would also point out that as part of our . . . What do you think the best example is? If you could just point me to a couple of your best examples of that. Sure. December 4th, 2015, there was a narrative report written by Dr. Harris. It was submitted as part of our administrative appeal to Unum, and this indicates the cognitive deficits that she is suffering from, and that is at the record 39-1 UNUM 53835384, and that is where I think those things come into play. What do you have in mind there, like the headaches and the fatigue and things like that? And memory loss, and it was described throughout the record, Your Honor, as brain fog. Right. Is the situation that she was dealing with. And I think importantly, you know, Judge Yandel, in her opinion, she did find that Dr. Harris's opinions carried more weight than the Unum physician reviewers, and that was because he had spent multiple visits with her, had ongoing care from 2008 until 2015, and so those were clearly helpful. I think the interesting thing when you reread the district court's opinion is there's nowhere in that opinion where they say that we have relied on Dr. Harris to say that she cannot perform each and every function of her regular occupation, but at the same time, we believe Unum's physicians that they can do, that she can do any occupation. I think that's the important point there, is that the district court in no way relied upon the Unum physician's opinions to draw that line at regular occupation and to say that, in fact, she could perform the any occupation analysis. I acknowledge that that's what Unum's physician said, but that is not what the district court relied upon. The district court relied exclusively upon what we think is a misstatement of law, is that there was a vocational analysis that was required, and we've cited extensively to the Tate decision by this court that comes straight out and says that that's simply not the standard. That was what was advocated in the Tate case, and they simply said that the court, the Seventh Circuit, although she could have provided an affidavit from a vocational expert, there is no requirement to do so if there is . . . But the district court didn't require that or mandate information from a vocational expert, did it? It said that you could have possibly met your burden with the vocational analysis or other information showing that the physical and other demands of relevant gainful occupations are prohibited for her. I think that's fair. Or other information, which the court didn't say or define what that other information was. True, and I think I overstate when I said requiring a vocational expert. It's vocational evidence, and I do think that is what the district court said was required. Number one, I would say the Tate decision says that's simply not the case if you have a physician that says that you cannot perform any work, and that's exactly what we have here in our when they said that vocational evidence is required. Number two, our position is vocational evidence was actually provided, and what's important, and it's actually cited in the district court's opinion. Dr. Harris was asked when UNUM was making its final disability determination in 2015, it specifically, and this is important, they did not send Dr. Harris the definition and description of her own occupation. They sent him the DOT descriptions for sedentary and light work, and that's what Dr. Harris reviewed and relied upon, and I would respectfully submit that when you have a doctor looking at sedentary and light occupations, those encompass and envelop any occupation that Ms. Doris could perform. I agree that there was not a vocational expert to say these are the occupations and the material duties for which she was reasonably suited. I understand that, but what we do know, even UNUM's physicians say she can't perform beyond a sedentary level. We have Dr. Harris receiving not only the description, those two descriptions in and of themselves envelop and encapsulate the actual any occupation definition, by definition, and so when Dr. Harris opines that you cannot, that she cannot perform those jobs, that is an any occupation analysis. Mr. Stolkamp, I got the sense in looking through the record here and the administrative record that both sides, in litigating this case, really focused on the first prong here, whether or not Ms. Doris could perform each of the material duties of her regular occupation, and that the second and third, of which the district court relied on, really had not been the focus of either party throughout, not just the litigation of the district court, but at the administrative level as well. Is that a fair observation? It's dead on. I think that when you look at the UNUM's decisions, they were cryptic at best in saying they went anywhere beyond the own or regular occupation definition, so you're absolutely right. That is what was focused upon at the administrative level, and quite frankly, it was also dealt with at the district court level, and I'm here to concede that we sought discovery, we didn't, the magistrate court denied it, and I didn't appeal that. I fully acknowledge that. We were not interested in having additional delays, quite frankly. Those were depositions that you wanted and didn't get? Right. You did get documents, right? Well, we got the administrative record. That's all? That's all, yeah. One of the depositions that we sought was the vocational expert, because it was unclear to us, you're saying these are the material duties of your regular occupation, but then we're also throwing these DOT descriptions into the mix, and so we were left with, at the time, a cryptic decision in terms of what we needed to address. Didn't the magistrate judge leave it open that you could come back and ask for additional discovery, that he was denying your request at the time because he thought it was duplicative? I think that, to be honest, I don't remember, but I think that's probably accurate. I think that's probably accurate. Is it fair to read Dr. Harris's December 14, 2015 letter as likewise being focused, as Judge St. Eve indicated, on whether your client could return to a prior job? I think that the materials he was provided was based upon what UNUM had provided us, and I think that the primary thrust of that was addressing that regular occupation. However, the ultimate conclusion was, just as it was in the Tate decision, is that Ms. Doris was incapable of performing any work. And it's clear, if you go back, at the time that UNUM made its decision, they had sent a June 2015 correspondence to Dr. Harris, and if you put it in context, after 24 months of benefits, which was in 2005, we're talking about 2015, presumably when UNUM sends that letter to Dr. Harris and gives the DOT definitions of sedentary and light, as opposed to the regular occupation, that that is, I guess, what UNUM was getting at, is that second prong, the after-24-month definition. But suffice it to say that Dr. Harris, clearly and unequivocally, actually throughout the entirety of his treatment for seven years, indicated that Ms. Doris was incapable of performing sedentary and light work, and again, by definition, that includes all of the jobs that she is reasonably fitted and suited for, by definition. Could you explain for me what your position is on this 20 percent less than prior earnings point, in particular, the role that you think plaintiff's volunteer work may serve in satisfying that requirement? So there's, yes, so on the 20 percent option, there's really three things that have to be proven, two of which the district court agreed with. Number one is that the appellant could not perform each and every material duty of a regular occupation, which is what she's currently doing, and that she's currently earning at least 20 percent less per month than her pre-indexed disability earnings. So those two things are, quite frankly, proven. So what we're left with is a comparison, essentially, of her regular occupation, the material duties of the regular occupation, and comparing those to what her volunteer work is. So it's simply a matching up of what those material duties are. Is it your position that if there's any overlap, and I'm not even sure at what level to address this, but if there's any overlap between her prior duties as a CFO and consultant and her volunteer work, that's good enough? I think that that, I think what you're asking for is, you know, kind of that outer liar situation where those things, I guess I would say, I don't know, because that isn't the case here. I would say respectfully that her work with Art on the Square as a treasurer, doing the invoicing, the banking, preparing the financial statements, there is a, just on its face, a clear overlap with the material duties of her job. And about how much time was she spending a week on that? Not many hours. It was clearly a part-time. One, two, five? You know, with Art on the Square, there were some weeks, you know, when it's only once a year, so I would say probably a few hours if you spread it out over the year, but it's very intensive right before and after the art show. But I guess I'd point out on that, Your Honor, the language of the policy itself controls on that, and that talks about full-time or part-time. It doesn't say substantial part-time work, a minimum of X amount of hours. There's no language. Your understanding would seem to make that pretty easy to qualify for somebody who's able to volunteer, for example. As long as those material duties match up. As long as those match up, I think, and that's what's clear here is that they do match up. Most of her volunteering was at the zoo, right? And that was up to about five hours a week? She was doing docent work at the zoo. She also was, in Belleville, they were moving St. Elizabeth's Hospital out to the suburbs, and so she did some opposition work with that, where she spoke publicly a few times. But I would say Art on the Square and the zoo work were probably the primary aspects of her volunteer work, and it's, quite frankly, an example of no good deed goes unpunished. She's being told that she's feeling better, and that's the record shows that, that she was getting better. So she's trying to do work and trying to be a productive citizen, and it ultimately gets used against her. But I think that those material duties that she performed with her volunteer work clearly overlap with her prior regular occupation. Thank you, Counsel. Thank you. For the defense, let's see, Ms. Herring. May it please the Court. Jacqueline Herring on behalf of the defendant, Unum Life Insurance Company of America. The district court, acting as the finder of fact in this case, carefully weighed the evidence and determined that Doris failed to satisfy her burden of proof to establish disability and entitlement to benefits under the plan. The district court's fact-intensive decision is subject to review for clear error, and that decision is not clearly erroneous. It reflects a plausible view of the evidence and should be affirmed. To obtain reversal, Doris has to establish a clear error in the fact-finding, and yet what she has asked this court to do is to simply re-weigh the evidence and come out in her favor. And there's certainly evidence on both sides in this case, and Judge Yandel carefully weighed what that evidence was and made a determination based on her weighing of the evidence. And that decision must stand unless it is not plausible in light of the entirety of the evidence. And even if there is another plausible alternative, even if Doris's position is also plausible, if the district court's view and findings based on the evidence are plausible, that gets past clear error review. And that's the standard that applies here. It's not a re-weighing of the evidence. It's not anything that Unum Life did or did not do during the administrative proceedings. It's not an arbitrary and capricious case. It was de novo review by the district court, which required the district court to make an independent decision based on its weighing of the evidence. And those fact findings are reviewed for clear error. Ms. Herring, what impact should it have on us that you did not raise the 20 percent less option in the policy as an affirmative defense? You raised the any gainful occupation prong, but not the 20 percent less option. Have you waived it because of that? No, Your Honor, because it's not an affirmative defense. It's Doris's burden to prove that she qualifies under the policy. It's not an affirmative defense that Unum Life has to do. It's not an affirmative defense. It's an aspect of Doris's burden of proof. And do you agree with the assessment that it really looks like both sides focused on that first prong that she cannot perform each of the material duties of her regular occupation and that the other two prongs were a little bit sidelined? Yes. And I certainly did because my client had five different physicians that said she is able to perform her regular occupation. So I thought that was, number one, very good evidence that she fails to satisfy the regular occupation. And, of course, if she doesn't satisfy regular occupation, she doesn't satisfy any occupation. But regardless of what the parties chose to focus on, Doris still has the burden of proof. And she can choose to focus on different elements or on different aspects, but that doesn't relieve her from her burden of proof if she wants to qualify for benefits under some portion of the policy. She has the burden to establish that. And she cannot simply choose not to focus on that and then on appeal turn around and say, oh, I should be given an opportunity to do so. Her opportunity to do that was in the district court when the district court was doing its work. Doris didn't present the district court with any sort of evidence or argument about what the duties were of any occupation. There is truly one sentence in the ruling. How does somebody meet their burden on that? There's not a job in the world I can perform. I think that there's a couple ways that they could do it. And, again, it would be up to the district court to weigh at what point that evidence becomes sufficient. I think that additional evidence, the district court certainly pointed to, you could have had some vocational expert. You can have a vocational expert identify what her . . . Well, I mean, what's the phrase? Any gainful occupation for which you're reasonably fitted by training, education, or experience could be virtually the world, right? And I'm trying to think, for example, in Social Security disability analysis, we deal with that through a burden shifting process. Correct. Is it your view that it's the plaintiff's burden to come forward with evidence that excludes the world of all occupations? I don't think you'd ever have to exclude the world of occupations. I think there would have to be enough evidence for the district court to find that you have sufficiently established that you're unable to perform those other occupations. Now, the rebuttal would always have to be coming from the insurer saying, okay, here's one that we think you can perform, right? Once she meets that burden, I think that would be true that there would need to be some . . . or not because the district court could decide that whatever evidence has been presented isn't sufficient. What's the standard for that? The standard for sufficient evidence that I can't do the duties of any gainful occupation for which I am reasonably fitted by training, education, or experience. Is that just left to the district judge's discretion? Well, it's a preponderance of the evidence standard so that would be the evidentiary standard. What the standard is for what specific evidence would be required to meet that, I think that would be a case and fact specific scenario. No standard up to the judge? I wouldn't say no standard, but I do think it's a case specific issue. Give me some help. Yes. What would have been sufficient here? I think a few things would have been useful. For example, the vocational analysis that the district judge suggested. In addition, in this particular case, Dr. Harris never quantified any specific functional limitations or restrictions for Doris. All that he offered to the district court and all that Doris offered to the district court was a blanket conclusion of she can't work. You know, there wasn't this specified she can't lift more than 10 pounds, she can't sit more than 10 minutes. She's gone through this neurocognitive testing that shows she's got memory problems, that she has problems with fatigue, concentration, and memory. There simply wasn't any quantifiable evidence. All of those things would assist in meeting the burden. You have a vocational analysis, you've got some specific medical functional limitations versus simply what Dr. Harris did is ultimately offer the district judge simply the legal conclusion that the she's disabled, she can't do any occupation. Are you saying that Dr. Harris's evidence would never be sufficient to meet that prong or that the district court weighed other factors and didn't, as to that prong, put full weight into Dr. Harris's opinions? I would not say that it could never be sufficient. I think had Judge Yandel determined that Doris was not able to do any occupation, I would be in a very difficult position in front of this court to argue that that was clear error because it would have some plausible support in the record. But there's also plausible support to the contrary and to suggest that any time a treating physician offers a bare conclusion that the claimant can't work, that it is implausible for the district court to find to the contrary, then we might as well not have judicial review. The court has to have, the district court has to have the ability to balance all of that evidence. And simply because that bare conclusion opinion exists on the treating physician doesn't mandate that the district court find that sufficient to satisfy the plaintiff's burden of proof. I read Dr. Harris's opinion, maybe I'm mistaken, but I tend to read it as focused on whether she could return to the prior job. Is that mistaken in your view? No. He's not, so one of the things she has on her resume is she has, before she worked in some of the more advanced managerial positions, she worked as a staff accountant. So I'm thinking, well, does she have the ability to work perhaps in payroll processing or accounts payable or something like that, you know, maybe 10, 20 hours a week. The problem is that there's just a gap on whether she's able to do that or not. I agree. And so I don't read Dr. Harris as so much speaking to that. I have him more in mind of, you know, can she return to her prior job running the company? And not only whether she could do that, but he's looking at evidence from 15 years ago back in time. You know, part of that report that Mr. Slocum referred the court to, he references how she was working so many hours that it was interfering with her treatment. Well, that's back in 2001, and there's absolutely no dispute that she has functionally improved as of 2015 when benefits were discontinued. Wasn't he also looking, though, at his treatment of her over the course of time? Yes, but when he's offering his opinions, there's a lot of information he's pulling from 15 years ago, rather than focusing on what specifically is her condition now. I don't know. I mean, that's the way you read the December 14, 2015 letter. I think it's kind of a here and now letter. It just doesn't get to the vocational capacity. He specifically references in that letter how her long hours were making it more difficult and interfering with her treatment. Well, the only time she was working those long hours was back in 2001. So I don't disagree that there's some information in there about the present, but he seems to be mixing all of that together, which, again, I do think undercuts some of the ultimate opinions in the absence of other supporting evidence, because there are normal examinations from other physicians. Frankly, most of Dr. Harris's examinations were normal. The clinical findings were normal. What he's citing, too, is what Doris is reporting to him, and that's a perfectly acceptable thing for a doctor to rely on, but when we're talking about was the district court clearly erroneous in deciding that that failed to be a burden of proof, that's a different issue. The district court's opinion here is well-supported and plausible based on the evidence. Ms. Herring, I'd like to take you back to the 20% provision in the policy. Yes, sir. I understood you to be saying you don't think Ms. Doris did a very good job of presenting that theory to the district court. Let me just ask you how you understand that provision as applied to sort of a cleaned-up hypothetical, but a person who is no longer working at her old job, which is like Ms. Doris' history, but who is working, let's say, one afternoon a week as a volunteer treasurer for the civic organization. I think that's exactly the type of thing that would need to be factored in, how many hours, what are you doing. Is it, in fact, part-time work? Treasurer, half-time, volunteer. Is that good enough? Does that qualify? It might, but, again, it would depend upon are you not earning because you're choosing to do volunteer work versus choosing to work in a paid position, so there would be other factors. How do you figure that? Well, the entire concept of disability is that you're unable because of... Yeah, I'm familiar with the concept of disability, but I'm also looking at the policy provision here. Right, and the policy provision requires that whatever your impairments are, that they're all because of an injury or sickness, so it would have to be because of injury or sickness that the earnings were reduced. Okay, she's got a pretty good record of that, that she can't work full-time, and Judge Yandel didn't seem to think that she could work full-time in her old job, so that would satisfy, those facts would satisfy the first part of that provision, right? Judge Yandel found, yes, yes, Your Honor. Okay, and I would think that working as a treasurer for a volunteer organization would amount to one of the material duties of your regular occupation on a part-time basis, right? It might, again, Doris specifically argued that she was not able to work even part-time, so I don't think, for example, working an hour a week qualifies as part-time performance of material duties, otherwise, balancing your checkbook for a few minutes becomes performing a material duty. Okay, I understand why you might think it ought to be interpreted that way, but how do we get that out of the policy language? I think we get that from the idea that you are performing duties of your regular occupation or another occupation on a part-time or full-time basis. That definitely suggests some continuity in what you're doing, that you're actually performing an occupation. Every week? One afternoon? I mean, you're talking, I'm talking about somebody who is more disabled than somebody you're describing or contemplating here, and you're saying, no, that would not qualify. That's a hard question to answer in a vacuum, Your Honor, I mean, it really is. I do think the policy suggests more than that, and the reason why is we're talking about material duties of an occupation, and to suggest that working one hour a week is performing occupational material duties, I don't think satisfies what disability means. Is that because of the one hour a week, the time portion put into it, or because of the work that's being done? Both, potentially, because I certainly think if I were standing here saying we cut off somebody's benefits because they were volunteering one hour a week, and therefore they were capable of working, everybody would find that to be arbitrary and capricious. We would. I know you would, Your Honor, and I believe the court has. And that's why I do think there's some balancing, and it becomes a fact-specific scenario, and the policy, certainly, by suggesting it needs to be full or part-time work, doing material duties, not just job tasks, but performing occupational material duties, it requires more. That's a very elaborate gloss on some pretty sparse policy language, I have to say, but I thank you for your attempt to address it, so anything else you want to tell us? Other than the district court's opinion is not subject, there is no clear error here, and her findings are plausible in light of the entirety of the evidence, the decision should be affirmed. Thank you. Let's see. Let's see, Mr. Slocum, your time ran out, but if you'd like a minute and a half to... I've got a better answer for you, Judge, on your first question on why we didn't agree to the neurocognitive exam. Number one is we did offer to do that as long as they reinstated benefits. If we were to have agreed to the neurocognitive exam, then the ERISA regulations requiring a specific response time would become meaningless, because you're talking about a procedural safeguard that's built in, and the case law, I understand this court has not adopted HALO, but we have a situation where we have a de novo review. So the only remedy for a procedural violation would be make a de novo review. We already have a de novo review because of the plan language, which would mean that if Unum or anybody else had had a de novo plan, they could simply wait until the last day and say, we want an open-ended extension for a neurocognitive exam, and then the ERISA procedural safeguards become meaningless. So I think that is a little better than my first chance. The second issue, briefly, Your Honor, is the Tate decision itself relied upon a physician saying that the person could not work, and that was enough. It wasn't that they needed a vocational assessment, and Your Honor, I do want to point out that the November 2015, August 2015, November 2015, and even back to June 2015, Dr. Harris was provided the DOT descriptions, and he made it clear that Ms. Doris was disabled from all employment. I agree that there were some where it was focused specifically on any regular occupation, but there are at least three or four specific instances where Dr. Harris clearly said that and that's exactly what is aligned with Tate. Judge Handel found that there was no evidence on that issue, and she was simply wrong about that. Okay. Thank you, counsel. Our thanks to all counsel. The case is taken under advisement.